May it please the court. I'm Albert Kirby. I represent appellants Karen Hansen and Betty Joram, and we're here today in large part because there's a major dispute as to what the claims of the complaint are, and under those circumstances, in evaluating subject matter jurisdiction, which iteration or claims thereof, determines what the standard is for removing of the case to from state court to federal court. We would look at the complaint under the guise of Washington pleading standards, which are very liberal and robust, and allow for a wide array of interpretations of complaint that allow for the claims to be determined by the plaintiffs in the way that the plaintiffs would like those claims to be presented. And in that regard, I would direct the court's attention to ER 75 paragraph 119, which says that the claims are only to the extent permitted under Washington law. So if we, in the complaint, say, allege a wide variety of misdeeds by group health, does not necessarily mean that we're seeking relief for all those claims, just as if we are alleging that, say, a group health was doing wrongdoing in Mississippi or California as a nationwide practice of wrongdoing, but we were filing claims in Washington state and Washington courts to the extent available under Washington law, we would not necessarily be pursuing claims in other forms under those forms laws. So I think we have a case, Cleghorn, and I think that's the one that I'm thinking of where the claimant tried to sever off claims that he thought might raise ERISA issues and get the complaint completely preempted and just said, well, I'm actually just looking at class claims about unfair practices. But we said, no, you really can't do that because the factual basis of this complaint is reimbursement for denied benefits. So are you saying that you would have us read the complaint as severing off any claim that would be based in ERISA or that would be preempted by Section 502 of ERISA? And does that work in this context? Well, I wouldn't say we're trying to sever anything off. We're just saying we're not alleging it as a claim in the first place because another valid interpretation in the context of pleadings and inferences being drawn in favor of the plaintiff in this case is that to the extent that we're alleging other wrongdoing general allegations, we're supporting a claim that there's general knowing willful violations. So this is part of a pattern or practice that justifies trouble damages under the state law claims. So the court thought, the district court thought that because there was an assignment to your clients, to Ms. Hanson and Joram, of a patient, an officiary, who had been denied reimbursement for some psychotherapeutic treatment, that the claim was actually seeking, or like some aspect of it was seeking reimbursement, or a declaration of benefits under the plan. So wasn't the district court entitled to make that interpretation of the complaint? Well, I think you're referring, Your Honor, the district court in footnote 2 on ER 6 was talking about repudiated group house interpretation, which is along those plans, though later in the district court's opinion, the district court didn't agree with our interpretation of the complaint, that we were limiting our claims to what we thought we were, the claims that we had to extend Washington law, that the claims were just as to Washington plans and general practices that prevented psychotherapists like Ms. Joram and Ms. Hanson from getting patients and clients in the first place. Mr. Kirby, let me ask you a question, if I can interject, just to understand the theory here. Let's assume for a minute that there was no ERISA, and that the patients had not made an assignment here to your clients. Would your clients have a right under Washington law to bring a claim against group health for unfair competition and sort of business torts or antitrust or any other kind of matter where they say they're being unfairly cut out of the business? Washington has a very robust consumer protection statute, which essentially says that any person, any business that interferes, I mean, engages in unfair or deceptive business practice that injures a person in their trade or property has a claim for damages. And if that violation is knowing or willful, it's trouble damages. And we are trying, with this case, to establish that psychotherapists can, in their own right to protect their trade, bring claims against insurance companies who engage in knowing and willful or just negligent, unfair and deceptive business practices. And in this way, what we're trying to accomplish is that some of the most vulnerable populations, the mentally ill, who are least equipped to advocate on their own interest, don't have to necessarily deal with the insurance companies directly. The psychotherapists can, in their own right, protect their trade in the prerogative to establish relationships with their clients, with or without insurance, but protect their own interests because they have independent interest, independent of the patients themselves. They have an independent right to engage in a trade without interference that's unfair or deceptive from insurance companies. They have a right, they should have a right to find clients, but the unfair and deceptive business practices of an insurance company prevent that patient psychotherapist relationship from forming in the first place, from the patient even finding a psychotherapist. There can be no assignment if there's no patient. You do in your description of the class, you do describe it as, let's see, denied or otherwise limited, those persons whom group health denied or otherwise limited authorization for reimbursement of the number of psychotherapy treatments which were provided or otherwise requested for authorizations. So it seems like the class would be people who were denied, providers who were denied reimbursement under various health plans. Well, Your Honor, we were filing in state court, Washington State Court, to the limits of Washington law. That may be some ambiguous language, and if the court deems that to be determinative, we'd be happy to clarify that as, like the court's case in Benko, established several years ago, in another context, removal with some ambiguity, we can clarify what's happening. Or before this even began, the appellees could have filed a motion for more definite statement to get some clarification as to what the claims were, if they were genuinely some dispute. And the district court did not give you an opportunity to amend, is that correct? That's correct. Basically, there were three interpretations of what the claims were. The court, we advanced our interpretation of what the claims were, group health advanced their interpretation of what the claims were, and then the court, in its order, gave its interpretation of what the claims were, and then in the same order, dismissed our claims without leave to amend. Okay. Thank you. In terms of our abilities here, reviewing this case, would we have the power to pare down your class allegations and say they're valid to a certain extent, but invalid in one respect? Well, before the court can do anything, there has to be subject matter jurisdiction, and I'm not, there's no subject matter jurisdiction here. So, I mean, the real issue in play here is, like, who, if there's dispute as to what the claims are, who makes that determination of what the claims are? So the district court thought there was, at least part of the complaint raised a subject matter jurisdiction, but could assert supplemental jurisdiction over the rest of the complaint. So if there's at least one claim that is, even a single claim that is preempted, is that correct? The district court would then have subject matter jurisdiction, but could assert supplemental jurisdiction over the rest of the state claims? Well,  that's a matter for interpretation as to whether all the state claims were, the court has its own interpretation, what's a state claim, what's a federal claim, and like the court, essentially, while disagreeing with group health as to, it's a group health assertion that we were seeking remedies under, as an assignee, or under these plans, the court then, the fulcrum of its analysis for subject matter, asserting subject matter jurisdiction under the first prong of the Davila test was that there were, there were two assignments for two plans. And so therefore we, Ms. Jorm and Ms. Hansen had a right, a remedy that they could pursue in ERISA for those two plans that, for some reason, apply to all other plans out there as well. And so dismissed everything, or assert subject matter jurisdiction on that. At least for all the ERISA plans. Yeah. Well, use that as basis to assert subject matter jurisdiction. And there's a kind of dissonance there. But be that as it may, the court was using the language of saying, because we alleged something, we were claiming something. And I think in the footnote that I referred to earlier, or thereabouts, the court was basically talking in terms of, we alleged something. And if you look at the same section that all these allegations, we just said, we also alleged like public policy issues in play, giving context to what's going on. That wasn't a section that said claims, that was just allegations. And our claims are enumerated and are, are defined by our prayer. Counsel, on the test for complete preemption that the Supreme Court has announced, is that a case called Aetna? Yeah. So am I right that the second prong that would have to be shown to get preemption is that there's no independent basis for the, for the claims? That's correct. Okay. So if the mental health providers that you represent have an independent basis for their claims under Washington unfair competition law, then doesn't that, that mean there should not be complete preemption? Correct. Okay. Thank you. You wanted to reserve some time. Okay. Just one question. Did you bring claims that the patient assigners could not bring? Yes. I mean, because one of the major aspects of the case was Ms. Joram and Ms. Hansen and providers like them were denied the opportunity to even have clients because of the actions of group health. But patients who did not receive benefits as a result could also bring that type of claim, couldn't they? But, but there's no relationship, there's no assignment. So, so anyway, I'll reserve the last 20 seconds. Thank you. Okay. Mr. Little. Good morning. May it please the court, Derek Little for the Eppley Group Health Cooperative. So, so I think what we have here is basically a claim for ERISA benefits that's been pleaded in terms of, of state law. And really you only have these three assignments that you managed to dig up from your file. I mean, the gist of the complaint has nothing to do with a claim for ERISA benefits or benefits at all. It's, it's this very broad claim that GHC engaged in unfair deceptive practices by using these guidelines in various nefarious ways. It was only because you all, they don't mention any patients or any assignments or anything. It's only because you dug these things up in your file, right? True. I think we were sort of guided in that by the Lodi Memorial Hospital case, which had district court case had very similar facts. And I think, you know, under the Davila test under prong one, you have to look and see whether there was an ability to bring a claim under 502 A1B. And in order to sort of probe that question, you have to look at whether assignments existed that would have allowed these particular providers to bring claims for recovery of benefits. Do they ask for reimbursement of benefits? I mean, other than the one mentioned that the class may include people who are owed reimbursement for benefits. I saw nothing to that effect in the complaint. Well, I think their, their complaint really is looking for medically necessary. And that appears many times. Well, that's just for the Parity Act. They have a pair of violation of the Parity Act, which uses the term medically necessary. So, I mean, that's part of it. But the gist of their complaint is, is the Unfair Practices Act, right? That, I mean, as I read it, that's what seemed to be the focus. I agree. I agree. They didn't separately allege a Parity Act violation, although there is an example of an ERISA case, ZD versus Group Health Cooperative, which was a successful Parity Act case brought under the terms of ERISA. So it's certainly possible to allege a Parity Act violation in terms of ERISA. And I think that is sort of. But they didn't do that. They said this, the fact that GHC wasn't complying with the Parity Act just showed how it was nefariously using these guidelines. Right. Right. No, I agree. They only have one cause of action, which is the CPA claim. But that claim really depends on the definition of medical necessity under the plans. Why does it? I mean, eventually you may raise that as a defense, but they can certainly allege that these guidelines are are aimed at unfairly disadvantaging patients. I think that's something along those lines is their claim. That is certainly the allegation. I believe the the test, though, under the Davila cases, you have to probe whether they could have brought these claims as as A1B claims. Well, counsel, under that case, isn't the second element for complete preemption that they have no independent basis for their for their claims? Yes. Yes. Yes, it is. So if if they're basically claiming that the hospital's policy is harming or providers market by saying they can't consult at group health, why wouldn't that be an independent basis for consumer protection? I think the reason is because that claim for unfair practices is sort of parasitic upon the notion that there's a viable claim for benefits, medically necessary benefits under the plan in the first place. So it's not an independent claim. It sort of depends on the existence of the plans. It depends on the definition of medically necessary under the plans. It requires an interpretation of this defined term under an ERISA plan. So I think it's very much a dependent. It's not independent. In the Davila case, the statute at issue was the Texas Health Care Liability Act, which requires ordinary care and coverage decisions. But there's a carve out and it doesn't, there's no liability unless the treatment at issue is covered under the plan in the first instance. And I think here we have a very similar situation. The allegation of unfair business practices depends on the question of whether these treatments are medically necessary under the plans in the first instance. So it's a very, I think it's, it's dependent. It's not an independent duty. It's a dependent duty. Could a complaint, assuming what you say is true in terms of the pleading, could a complaint be redrafted that did not allege anything dependent on the medical necessity? I struggle to see how that could be done. I mean, I think the crux of this is a claim for benefits that were allegedly, you know, denied or improperly. They're certainly not claiming benefits. They're claiming injury to their practices due to these nefarious practices of GHC. They're saying they won't sponsor the, they won't allow patients to seek these therapies. They limit the amount that's paid on the therapies and they channel the patients to their, their farm team of therapists. And so because of that, they're not getting the stream of revenues that they would otherwise get. So they're not seeking any individual patient was not reimbursed or wasn't treated appropriately. They're, they're talking as a business entity, this is hurting their business. So why isn't that enough under, under Davila? I hope I'm not being repetitive. I think the test, maybe I'm not grasping this, the test under Davila is, is, is, would it, would it have been possible for these providers to bring a claim? But that's not true for third parties, is it? I mean, we've held for the third party cases that they're able to pursue their own remedies, even if they could have pursued the patient's remedies. It might be helpful to know a citation. I know that appellants have cited a number of cases and they all involve some sort of separate agreement. For example, the Blue Cross versus anesthesia care involved a separate provider agreement. Why does that make a difference? If they could have pursued a patient remedy, it's the same argument. Well, I think in that case, I mean, you can distinguish it because there's a contract, but the idea was the third, third parties bringing an action can bring their own suit. They have a, in that case, I think it flunks prong to a Davila because they did have an action to do with interpreting the plan itself. It had nothing to do with, with what's covered under the, under the plan. So your position is that the plaintiffs here couldn't prove that the, the guidelines, the MCG guidelines are deceptive and nefarious is the word I keep coming up with, without looking at any of the treatment of any individual patient. Why is that your position? And why is that? I think, um, Judge Gouldrade is a good point. You know, if there was no ERISA, they could, but the fact of the matter is we do have ERISA. We have a comprehensive remedial scheme that was set up to address these kinds of issues about what is medically necessary. So if I say the guidelines, um, are, um, uh, an unfair business practice and objectively unreasonable under current medical guidance, do I need to look at the plan in order to win on that? Um, I think the, the question under, under Davila is, is could you, it's not, it's not sure you could go and allege a CPA claim. That's, that's sort of beside the point, whether you have a viable state law claim, the inquiry under prong one of Davila is would it have been possible to bring this as an ERISA case? And in this case, we know that these specific providers, the three claims that are in the record, they actually were pursuing, uh, appeals to the administrative process with respect to three of their patients. So we know that they could do it. We know that the assignments were effective. We know that they, they can change lead plaintiffs and had a lead plaintiff who didn't have an assignment, then that would be okay. Is that, that maybe they just got the wrong lead plaintiffs. Is that the idea? That's a hypothetical. It sounds like a trick question. Those aren't, those aren't the facts. But if they, that's a, they're, they're having a purported class. So they, they choose other class members who don't have any assignments. And with that, um, that would avoid the, the, the question as to whether if they had a single assignment, they could bring it as an ERISA claim, right? So they would have no assignments at all. So what, what would be the analysis there? I think that would be problematic. I mean, I think, you know, the assignments are critical to the analysis here. Thank you. It's a hard case. Um, so I think we've, we've talked about most of what I wanted to address. Um, I, I think, uh, you know, in terms of the, the remedies that are sought, we, we heard, um, appellants counsel talk a lot about, uh, the triple damages and so forth as being, uh, a reason to avoid preemption. And I think that was, uh, squarely addressed in the Davila case, uh, where, um, the availability of different damages under, uh, uh, a state law claim does not get you there. That's not sufficient to avoid preemption. Um, counsel, doesn't the mental health parody act have a definition of medically necessary? Um, the statute, it's a good, uh, I know, I know it defines mental health services. Uh, I think, um, it, it, it, it actually defers to, uh, the plans to define medically necessary. I'm my memory is a little bit hazy on that, but I, I do think that it actually reverts to, uh, a medical necessity definition as it may, it may be, it may be as determined by the plan director so that the plan director has discretion to medical necessity, but I'm unfortunately my memory of that is a little bit, a little bit hazy, but I do, I do think that you would end up reverting, uh, to looking at the plan definition of medical necessity. And I think that sort of underlines the real difficulty with plaintiff's case here is that you are going to be interpreting a defined term in ERISA plans through the lens of an unfair business practices, state law, and that is in direct conflict with the comprehensible comprehensive remedial scheme that's sort of envisioned by the guidelines that are complained about are not part of the plans, are they? That that's, that's correct. They're, they, they, they, they guide medical necessity terminations under the plan. So they're sort of, uh, an adjunct of sorts, an adjunct, right. But you don't have to interpret the plan to get to the guidelines, right? I would, I would disagree. Uh, I think you do have to look at the plan and how medical necessity is defined. It has an eight part definition. It's very extensive and complex. And you would have to look and see, okay. Is use of these clinical criteria, is that consistent with the definition of medical necessity? You'd have to do that if you wanted to prove a violation of the plans. But, um, I think Judge Tuneim's question is a good one. If you're just challenging and I have the same question. If you're just challenging the plan as being the guidelines as being objectively unreasonable, you wouldn't have to see whether there was any violation of, uh, the, what the plan had approved. Right. I think, I think the, the, the inquiry is whether you would be able to do this regardless of the fact that you may be able to do this otherwise, do you have the ability to challenge these guidelines through an ERISA A1B claim? Well, what's your best case for that? Because in all of the cases that I saw where they raised that, uh, it was pretty clear that the complaint was fairly directly interested in some individual being denied reimbursement as opposed to this very generic unfair practices claim. So what's the closest, do you think? I, I go back to the Davila case, I think, um, you know, that's a, that's a case that's, uh. Where he was denied benefits. I mean, there was a, there was a specific problem with that for that individual. And, and most of ours, um, follow that, that route. And so I was interested in what's, what's the best for sort of a generic claim by third parties? Well, I, I go back to, I'm not sure if this is the greatest case, but the, the Missick case, which is an older Ninth Circuit case, which was the one that sort of established the principle that, that a provider can step into the shoes of the, of a beneficiary with a very minimal, you know, reimbursement assignment. It's not, it's not a fancy assignment, but can go step into the shoes of the beneficiary and bring in an A1B claim to recover benefits that are due under the plan. Um, so I think that, that, that basic rule has never been overturned by, by this court. Thank, thank you, Mr. Little. I guess we have, uh, some rebuttal time with Mr. Kirby. I have 20 seconds. Um, and for that, I just read the definition of mental, uh, uh, medically necessary in the context of mental health statute by the Washington Supreme Court says for being medically necessary, the service does not need to cure the illness. It is sufficient to treat the symptoms of the illness. OST versus Blue Shield, 181, Washington 2nd, 691, page 705. Thank you. Thank you, Mr. Kirby. Uh, I want to thank, uh, Mr. Kirby and Mr. Little for your excellent arguments. You guys make me a little homesick for not practicing law anymore. I enjoyed both your arguments. The, uh, the case of, uh, Hansen and Geram versus group health shall be submitted.
judges: Gould, Ikuta, Tunheim